**STEARN et al. v. UNITED STATES et al.**

No. 174.

United States District Court.
W. D. Virginia, Harrisonburg Division.
July 12, 1949.

Glen F. Morgan, Washington, D. C., and Charles A. Nelson, Harrisonburg, Va., for plaintiffs.

Edward M. Dumbauld, Sp. Asst. to the Atty. Gen., and Herbert A. Bergson, Asst. Atty. Gen., for the United States.

Daniel H. Kunkel, Washington, D. C., for Interstate Commerce Commission.

Before DOBIE, Circuit Judge, PAUL, Chief Judge, and BARKSDALE, District Judge.

PAUL, Chief Judge.

The plaintiffs in this action, J. M. Stearn and Dan Hartman, who will hereafter be referred to as Stearn and Hartman respectively, are both motor carriers in interstate commerce. The purpose of the action is to have the court vacate and set aside an order of the Interstate Commerce Commission (hereafter referred to as the Commission) which denied approval of a proposed sale and transfer by Hartman to Stearn of certain of the former's operating rights. Jurisdiction is invoked under 28 U.S.C.A. § 41(28), now 28 U.S.C.A. § 1336, and 49 U.S.C.A. §§ 17(9) and 305(g). (Note: Since initiation of the proceedings I. W. Moore had become successor to the business of Hartman and has entered as a plaintiff. This in no way affects the matters involved in the case).

An outline of the facts and the proceeding leading to the present status of the case and upon the basis of which the action of the court is asked seems desirable, although the question presented is not complicated.

On March 13, 1942, Stearn was granted a Certificate of Public Convenience and Necessity authorizing him to engage in the interstate transportation by motor of certain commodities between named points and over designated routes. The commodities which he was authorized to transport were of a varied nature and the points between which and the routes over which each might be hauled were designated. Among the rights granted, as set out in the certificate, was the following:

"Butter, eggs, and live and dressed poultry.

"From Harrisonburg, Va., to Philadelphia, Pa.:

"From Harrisonburg over U. S. Highway 11 to Stephens City, Va., thence over Virginia Highway 277 to White Post, Va., thence over Virginia Highway 12 to Boyce, Va., thence over U. S. Highway 50 to Washington, D. C., thence over U. S. Highway 1 to Baltimore, Md., thence over U. S. Highway 40 to junction U. S. Highway 13, thence over U. S. Highway 13 to Philadelphia.

"Service is authorized to the intermediate points of Washington, D. C., and Baltimore, Md., restricted to delivery only; and from the off-route points of Broadway and Timberville, Va., restricted to pick-up only."

On August 12, 1942, the Commission granted to Hartman a certificate authorizing the transportation by him in interstate commerce of specified commodities between various points and over specified routes. This authorization likewise included commodities of various sorts and over specified routes for each. Among the rights granted was the following:

"Eggs and poultry"

"From Harrisonburg, Va., to New York, N. Y., as follows:

"From Harrisonburg over U. S. Highway 11 to Stephens City, Va., thence over Virginia Highway 277 to White Post, Va., thence over Virginia Highway 12 to Boyce, Va., thence over U. S. Highway 50 to Washington, D. C., thence over U. S. Highway 1 to Baltimore, Md., thence over U. S. Highway 40 to junction U. S. Highway 13, thence over U. S. Highway 13 to Philadelphia, Pa., and thence over U. S. Highway 1 to New York; and

"Return with no transportation for compensation except as otherwise authorized herein, over these routes to Harrisonburg.

"Service is authorized to and from the intermediate points of Washington, D. C., Baltimore, Md., and Philadelphia, Pa., for delivery only and the off route points and places in Rockingham County, Va., for pick-up only."

It will be noted that both carriers operated out of Harrisonburg, in Rockingham County, Va., and that the rights granted them in respect to those commodities specifically mentioned above differed only in the following respects: While they operated over identical routes from Harrisonburg to Philadelphia, Stearn's rights ended at the latter point, while Hartman continued on to New York. Stearn was permitted to haul butter, eggs and poultry while Hartman handled eggs and poultry only. Stearn was limited to pick-up at two off-route points (Broadway and Timberville) in Rockingham County, while Hartman, apparently, could pick-up at any off-route point in the county.

On November 8, 1943, after the parties had sought approval therefor, the Commission entered an order authorizing the lease by Hartman to Stearn for a period of one year of the former's right to transport eggs and poultry from Philadelphia to New York over U. S. Highway 1; the service being restricted to traffic moving from points on Stearn's regular routes south of Philadelphia. The effect of this was simply that Stearn took over under lease the operating rights which Hartman had been exercising between Philadelphia and New York. On November 3, 1944, the Commission by appropriate order approved the extension of this lease until January 12, 1945, under the same terms and conditions; and thereafter upon request of the carriers the lease was extended from time to time until September 3, 1947.

While this lease was in force Hartman and Stearn, on or about November 8, 1944, filed their joint application with the Commission seeking its approval of the sale and transfer by Hartman to Stearn of that portion of the operating rights granted to Hartman by the certificate of August 12, 1942, which related to the transportation of eggs and poultry between Harrisonburg, Virginia, and New York City, and which has hereinbefore been set out. This application is designated No. MC-FC-20350. On the same date the same parties filed an application for approval of the transfer to Hartman of Stearn's rights to transport eggs and poultry from Harrisonburg to Philadelphia. This is designated No. MC-FC-20351. Apparently the result of these proposed transfers between Hartman and Stearns would have been merely an exchange of their rights as to the transportation of eggs and poultry.

These applications were denied by the Commission by orders entered February 15, 1945, without formal hearing and without any report setting forth reasons for the denial. A petition by the applicants for review and reconsideration was similarly denied by an order of May 7, 1945. Thereafter on October 1, 1945, the plaintiffs instituted this action praying that the denial orders entered on February 15, 1945, be set aside and that the applications be remanded to the Commission for further proceeding. After suit was instituted and before any answer had been filed the Commission, on its own motion, vacated its orders of February 15, 1945; and some time later assigned the applications for oral hearing together on May 9, 1946, before an examiner. As a result of this hearing the examiner made a report recommending the approval of both applications. Railroad carriers which had intervened but had offered no evidence at the hearing excepted to the examiner's report in MC-FC-20351 (the transfer by Stearn to Hartman) but did not oppose the transfer by Hartman to Stearn involved in MC-FC-20350.

Thereafter the examiner's report and recommended order came before Division 5 of the Commission, which refused to accept the examiner's recommendations, and by a report and order entered on June 11, 1947, denied both applications. It is not clear whether the plaintiffs abandoned their application MC-FC-20351 prior to this action of the Commission or following it. In any event a petition for reconsideration of the order of June 11, 1947,

was filed limited to the action of the Commission on application MC-FC-20350. By an order of October 29, 1947, reconsideration was denied. On August 27, 1948, the plaintiffs filed their amended and supplemental complaint reciting the course of events since the date of the original complaint and attacking the action of the Commission only as to application MC-FC-20350—the proposed transfer by Hartman to Stearn.

What the plaintiffs propose to do, and which the Commission refuses to approve, is that Hartman sell and transfer to Stearn the rights which Hartman now has to transport eggs and poultry from Harrisonburg to New York over routes via Washington, Baltimore and Philadelphia—as set out in the certificate granted him on August 12, 1942. As previously noted Stearn, under his certificate (granted March 13, 1942), already has and is now exercising the same rights over identical routes as far as Philadelphia. The result of the transfer would be that Hartman would cease any transportation of eggs and poultry over these routes; while all that Stearn would procure would be the right to go on from Philadelphia (his present terminus) to New York and the right to pick-up at any point in Rockingham County instead of the limited pick-up points which he now has. In fact the results accruing to Stearn by the proposed sale would be merely to make permanent the results accomplished under the lease from Hartman to Stearn which was in effect for approximately four years with the approval of the Commission; with the exception that Stearn would acquire additional pick-up points in Rockingham County.

In dealing with the rights of carriers to merge or to transfer their properties there are two provisions of the Interstate Commerce Act to be considered. In section 5, paragraph (2) (a) and (b), 49 U.S.C.A. § 5, it is provided in substance that any carrier may purchase or lease the whole or any part of the properties of another, provided the Commission approves the purchase after a finding that it is consistent with the public interest. Paragraph 10 of this same section, however, provides

that: "(10) Nothing in this section shall be construed to require the approval or authorization of the Commission in the case of a transaction within the scope of paragraph (2) where the only parties to the transaction are motor carriers subject to chapter 8 of this title (but not including a motor carrier controlled by or affiliated with a carrier as defined in section 1 (3) ), and where the aggregate number of motor vehicles owned, leased, controlled, or operated by such parties, for purposes of transportation subject to chapter 8 of this title, does not exceed twenty."

In the Interstate Commerce Act, Part II, dealing with Motor Carriers, Sect. 212 (b), 49 U.S.C.A. § 312 (b), provides that: "(b) Except as provided in section 5 of this title, any certificate or permit may be transferred, pursuant to such rules and regulations as the Commission may prescribe."

It is not questioned that the plaintiffs filed their application before the Commission in due form and that Stearn is able and equipped to operate satisfactorily the rights which he seeks to purchase. The Commission specifically found that neither Hartman nor Stearn is controlled by or affiliated with any other carrier and that the aggregate number of vehicles owned, leased or operated by them does not exceed twenty. The application therefore came within the provisions of Section 212 (b) of the Act, heretofore quoted, 49 U.S.C.A. § 312 (b) and was subject to the transfer rules established by the Commission.

The Commission rests its denial of the proposed transfer on the ground that it is contrary to the transfer rules established by it and cites its Rules 179.1 (c) and 179.2 (c) as follows:

"Sec. 179.1(c)  An operating right may be divided as to routes or territories, and part thereof transferred, provided such routes or territories are clearly severable and the division thereof does not permit the creation of duplicate operating rights. No division of operating rights based upon the class or classes of property authorized to be transported will be approved, unless it appears to the satisfaction of the Com-

mission that the part of the operating rights sought to be transferred is, because of a difference in the nature or type of the service rendered, clearly distinguishable and severable from the remaining operating rights.

"Sec. 179.2(c) Except as provided in rule 1(c) the proposed transfer described in any such application shall be approved if it appears that the proposed transaction is one which is not subject to the provisions of section 5, Interstate Commerce Act, that the proposed transfer, if approved, will not result in unlawful ownership or control of a motor carrier, and that the proposed transferee is fit, willing, and able properly to perform the service authorized by the operating rights sought to be transferred, and to conform to the provisions of the Interstate Commerce Act and the requirements, rules, and regulations of the Commission thereunder. Otherwise the application shall be denied."

The Commission then holds that what the applicants seek is a division of operating rights based upon the class or classes of property authorized to be transported and that this is not permissible under the rules laid down by the Commission. To the ordinary mind, whether lay or legal, the proposal would seem to be not a division of rights but a sale whereby rights now owned by Hartman were taken over by Stearn and merged with the rights already exercised by him. There would be no duplication of rights and no added traffic to the highways. In fact the contrary would be the case. Stearn, who already operates to Philadelphia, would acquire merely the additional right to continue to New York; while Hartman would cease to transport these commodities over any part of this route. As stated by the Commission this was the result of the lease between the plaintiffs, heretofore referred to. (See Commission's report, sheet 4, last paragraph).

The reasons actuating the carriers in entering into the lease and in the proposed transfer seem to be sound and economically wise. Poultry, eggs and butter are classed as "wet" freight; they must be transported under refrigeration. Stearn operates trucks equipped with mechanical refrigeration and adapted to handling this class of freight. Hartman is not equipped with mechanical refrigeration but in handling eggs and poultry refrigerates with wet ice, an element which is uncertain in the maintenance of constant temperatures and which makes impractical the handling of "dry" freight in the same vehicle. Apparently Hartman wishes to concentrate on the handling of dry freight and to forego transportation over this route of the perishable commodities which he is not specially equipped to handle; while Stearn, who has the necessary equipment to handle eggs and poultry, desires to take over the right which Hartman finds it advisable to surrender.

The examiner to whom this application was referred for hearing and before whom evidence was taken was of opinion, and so reported, that the handling of eggs and poultry was a specialized form of service differing from that involved in the handling of dry freight. He accordingly recommended that the application be approved as coming within the terms of the Commission's regulation Sect. 179.1(c) which permits the transfer of a part of a carrier's operating rights where the part sought to be transferred is, because of a difference in the nature or type of service, severable from the remaining operating rights. The Commission overruled this recommendation, and in referring to the question of whether the handling of "dry" freight involves a different type of service from that of handling the perishable goods here involved the Commission's report held "that refrigerator equipment is not special equipment and its use does not make the service rendered substantially different from that rendered with ordinary equipment."

This holding appears to be based on the view that because equipment used for the transportation of dry freight can, if sufficient refrigeration with wet ice is provided, be used to haul perishable goods, there is no difference in the type of service between hauling dry freight and perishable freight; that the only test is whether different types of vehicles must be used.

But it ignores any difference in the nature of the commodity handled or any difference in the nature of the preparation and care for its safe transportation; and it ignores the fact that dry freight and wet freight cannot be hauled in the same vehicle at the same time.

It is to borne in mind that Congress never intended to bar the right of a carrier to lease or sell and transfer its operating rights or parts thereof so long as the results of such action were not contrary to the public interest. In fact the right to do so is specifically provided for in the Interstate Commerce Act. See Section 5 of the Act, 49 U.S.C.A. § 5(2), where the conditions under which such transfers may be made are set forth in detail, and where, Section 5(2) (c), there are enumerated certain primary considerations governing the approval of such transactions. The provisions are applicable to railroad carriers and, since repeal of Section 213 of the Act by the Act of Sept. 18, 1940, 54 Stat. 924, to the large motor carriers. As to the small motor carriers (those having less than twenty vehicles), the transfer of operating rights has been left subject to "such rules and regulations as the Commission may prescribe." Section 212(b) of the Act, 49 U.S.C.A. § 312(b). See U. S. v. Resler, 313 U.S. 57, 61 S.Ct. 820, 85 L.Ed. 1185.

■ But where Congress has entrusted an administrative agency to carry out the purposes of a statute under rules and regulations prescribed by the agency, there is a necessary implication that such rules and regulations must be consistent with the purposes of the statute and reasonably adopted to carry out those purposes; that they must not be contrary to or go beyond the Congressional intent. There have been a number of cases emphasizing this principle. See Miller v. U. S., 294 U.S. 435, 440, 55 S.Ct. 440, 79 L.Ed. 977, referring to regulations promulgated by the Veterans Administration; Rodney Milling Co. v. U. S., 75 F.Supp. 707, 715, 111 Ct.Cl. 625; and U. S. v. 200 Barrels of Whiskey, 95 U.S. 571, 576, 24 L.Ed. 491, both dealing with regulations of the Bureau of Internal Revenue; Campbell v. Galeno Chemical Co., 281 U.S. 599, 610, 50 S.Ct. 412, 74 L.Ed. 1063, rules of the Commissioner of Prohibition; Manhattan Co. v. Commissioner of Internal Revenue, 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (a tax matter) where it is said: "The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law, for no such power can be delegated by Congress, but the power to adopt regulations to *carry into effect the will of Congress as expressed by the statute*. A regulation which does not do this, but operates to create a rule *out of harmony with the statute,* is a mere nullity." (Emphasis supplied.)

■ The broad language "such rules and regulations as the Commission may prescribe" is not an authorization to adopt any rule the Commission may fancy. In U. S. v. Resler, supra, wherein it was established that transfers of operating rights between small motor carriers was subject to regulations of the Commission the court was careful to point out, 313 U.S. at page 60, 61 S.Ct. at page 821, 85 L.Ed. 1185, that "Undoubtedly the power to prescribe regulations is not unlimited".

■ We are of opinion that the rule upon which the Commission based its decisions, certainly as applied to forbid the transaction here involved, not only fails to carry out the will of Congress as expressed in the statute but is out of harmony with the Congressional intent that operating rights might be freely transferred so long as the public interest was not harmed thereby. It would be unreasonable to assume that Congress intended to authorize the Commission to govern the transfer of operating rights between small motor carriers by regulations more restrictive and resting on entirely different considerations than those which Congress had set forth in the statute to govern such transactions between the railroads and other major carriers. That the rules of the Commission do not grant these small motor carriers that degree of liberty of action which Congress set forth in Section 5 seems to be recognized by the Commission when, in its report, in denying the ap-

plicability of certain cases cited in support of the application, it is said: "The decisions in the cases cited and in similar cases are not here controlling. The transactions considered in the cited cases were subject to Section 5 of the act. As previously indicated, the transfers here proposed are not subject to that section, but are subject to the transfer rules, and may not be approved thereunder."

■ It must be assumed also that when Congress entrusted the matter of transfer of rights between the small carriers to such rules as the Commission might prescribe it was intended that the rules adopted should be reasonable and that their formulation and application should have a logical relationship to the furtherance of the public interest and convenience. In this connection we are struck with another statement in the Commission's report, as follows: "We desire to point out, however, that approval or disapproval of the proposed transfers depends upon their conformance or non-conformance with the transfer rules and not upon proof or lack of proof of their consistency with the public interest."

It may be that the attitude of the Commission is not actually as arbitrary as might be inferred from the foregoing statements. It is to be noted also that in making them the Commission was considering along with the instant matter the application involved in MC-FC-20351 which proposed a reciprocal transfer by Stearn to Hartman. However, after the latter was abandoned and reconsideration was sought only of the instant application, the Commission denied the petition without further discussion and in reliance on its previous opinion. There is nothing to indicate why the Commission, after approving a lease of these operating rights for almost four years, should forbid their sale on the ground that it would be violative of a rule which had been in existence during the period of the lease. Neither does the Commission's report point out any respect in which the proposed transfer would be contrary to the public interest. It leaves the impression that having adopted a rule which it construes as forbidding this trans-

action the rule must be adhered to for its own sake; and that neither the natural right of the parties to deal with their property nor the effect upon the public interest is a factor in the matter.

In summary, what we have here is this: One small motor carrier possessing operating rights as to certain commodities which he is not well equipped to handle and which he finds unprofitable desires to transfer these rights to another small motor carrier who has special equipment for handling the particular class of commodities involved and who is already operating over the major portion of the same route; the result of which transfer would add nothing in the way of additional traffic to the highways but on the contrary would permit one carrier to handle the business now divided between them.

We might add that it appears to us, as it appeared to the examiner and as we believe it would appear to most persons, that the transportation of perishable commodities in refrigerated vehicles represents a different type of service from the carrying of ordinary or "dry" freight and that the proposed transfer might well be held permissible under the provisions of the Commission's regulation. However, we do not rest our conclusion upon this ground, but upon the terms and application of the rule itself.

■ We realize that regulations of the Commission, formulated in the light of its informed experience should be accorded all favorable presumptions as to their wisdom and propriety. And we are not prepared to say that the rule (section 179.1(c) ) is unreasonable under all circumstances; as, for example, where a division of operating rights would lead to a duplication of service or would place additional traffic upon already congested highways to the detriment of the public convenience. But none of these results would ensue from the transaction here proposed. And to so apply the rule in question, or any other, as to deny these carriers the right to make the simple transfer here involved is, in our opinion, to place an unjustifiable and arbitrary restriction on a right which Congress intended they should have, and is an un-

reasonable and unauthorized exercise of the powers granted the Commission.

We conclude, therefore, that the order denying approval of the application involved in MC-FC-20350 should be set aside and this matter referred back to the Commission with directions to approve the transfer of operating rights which the plaintiffs propose.