**AAACON AUTO TRANSPORT, INC.,**
Plaintiff,

v.

**UNITED STATES of America and Interstate Commerce Commission,**
Defendants,
**Nationwide Auto Transporters, Inc.,**
Intervening Defendant.

Civ. No. 72–2221.

United States District Court,
S. D. New York.

July 6, 1972.

As Amended On Motion for Reargument and/or Reconsideration Denied
Sept. 1, 1972.

Paul Zola, New York City (Zola & Zola, New York City, of counsel), for plaintiff.

Theodore C. Knappen, Atty., I. C. C., Washington, D. C. (Whitney North Seymour, Jr., U. S. Atty., New York City, Fritz R. Kahn, Gen. Counsel, Walker B. Comegys, Acting Asst. Atty. Gen., and John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., of counsel), for defendants.

Harold G. Hernly, Arlington, Va. (Harold G. Hernly, Jr., and Wrape & Hernly, Arlington, Va., of counsel), and Gordon H. Marsh, New York City (Peter W. Williamson, and Williamson & Schoeman, New York City, of counsel), for intervening defendant.

Before FRIENDLY, Chief Circuit Judge, FRANKEL and BRIEANT, District Judges.

FRIENDLY, Chief Circuit Judge:

This is an action by Aaacon Auto Transport, Inc. (Aaacon), holder of a certificate under the Motor Carrier Act for the driveaway of automobiles,[1] to enjoin an order of the Interstate Commerce Commission. The order, No. MC–FC–72889, summarized at 36 F.R. 22795 (1971), authorized Dealers Transit, Inc. (Dealers) to transfer to Nationwide Auto Transporters, Inc. (Nationwide) Dealers' non-radial rights to transport automobiles in secondary movements[2] in driveaway service between points in 44 states, with an exception not here material. The price was $300,000, of which Nationwide paid $25,000 into escrow in advance. An additional $10,000 was to be paid on consummation and $265,000, plus $6\frac{1}{2}\%$ per annum, in 60 monthly installments. The order, as modified, contained a condition that neither Dealers nor its affiliates should engage in service similar to that permitted under the authority being transferred to Nationwide, although the certificates of one company affiliated with Dealers when

---

1. "Driveaway" means that the vehicle to be "tranported" is itself driven to the destination, rather than placed on truck, rail car, or other mode of transportation. Driveaway "carriers" employed drivers skilled in the operation of all vehicles on which they post tariffs, as well as casual drivers whom they solicit through newspaper advertisements. As to the latter, see ICC v. AAA Con Drivers Exchange, Inc., 340 F.2d 820, 822–823 (2 Cir.), cert. denied, 381 U.S. 911, 85 S.Ct. 1533, 14 L.Ed.2d 433 (1965) and decisions cited therein.

2. A "primary" movement is from the place of manufacture or assembly to the place of destination; a "secondary or subsequent" movement can generally be described as anything other than primary. Thus, a newly manufactured truck is often driven from the assembly plant to the customer. Such a movement would be primary. However, if a corporation simply desired to have some of its vehicles moved from one point to another, or if a business executive who had been transferred across the country desired to fly and have his car follow him, such driveaways would be secondary.

the proceeding began and another acquired by it thereafter authorized such service.[3]

The order avowedly was made pursuant to § 212(b) of the Motor Carrier Act of 1935, now Part II of the Interstate Commerce Act, 49 U.S.C. § 312(b), which provides:

> Except as provided in section 5 of this title [49 U.S.C. § 5], any certificate or permit may be transferred, pursuant to such rules and regulations as the Commission may prescribe.

This provision was intended to permit the Commission to design a simple and expeditious procedure for the relatively free transfer of certificates as to which Congress determined that any minor effect on competition did not warrant "a great deal of red tape with the Commission."[4] After appropriate rulemaking procedures under § 4 of the Administrative Procedure Act, 5 U.S.C. § 553, the Commission promulgated regulations, commonly referred to as the Transfer Rules, now 49 C.F.R. Part 1132.

Broadly speaking, the scheme of the Transfer Rules is as follows: In the first instance the application is solely a matter beween the applicants and the Commission, acting through its Motor Carrier Board subject to review by a division of the Commission, acting as an appellate division. See 49 U.S.C. § 17. Section 1132.3 provides that the application is to be granted if it is shown that the transaction is not subject to

§ 5 and that the transferee is fit, willing and able to perform the services and to conform to the Act and the Commission's requirements thereunder; otherwise the application is to be denied. Section 1132.5 sets forth "general bases for disapproval," of which more hereafter. An order granting approval must be published in the Federal Register, § 1132.4. Only at this point does the opportunity for opposition arise. Section 1132.4 provides in part:

> The notice accompanying such publication [of an affirmative order] will refer to section 17(8) of the Interstate Commerce Act [49 U.S.C. § 17(8) (stay of decisions, orders, etc.)] and include a requirement that if a petition [for reconsideration] is timely filed by an interested person seeking reconsideration or oral hearing, such petition must specify with particularity the alleged errors and shall cite in all cases the particular section or sections of this part [the transfer rules], and the arguments based thereon, which petitioner believes warrant a conclusion different from that set forth in the affirmative order. In the absence of citation of the particular section relied upon, the petition may be rejected. *If the petition contains a request for an oral hearing, the request shall be supported by an explanation as to why the evidence sought to be presented cannot reasonably be submitted in affidavit form.* (Emphasis supplied).

---

3. Although Aaacon questioned the legal effectiveness of this condition on the affiliates, we think it clear that by applying for and making the transfer, Dealers bound itself to see that the condition is fulfilled as long as the affiliation continues. Compare New Haven Inclusion Cases, 399 U.S. 392, 427–428, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970). Further, counsel for the Commission informed us at oral argument that the Commission intends to issue new certificates to Dealers' affiliates which will embody these restrictions. Once this is done, the restrictions would be effective on the rights of the affiliates even if those rights were subsequently sold to a third party.

4. Remarks of Senator Wheeler, 79 Cong. Rec. 5655 (1935), quoted in Chemical Leaman Tank Lines, Inc. v. United States, 251 F.Supp. 269, 272 (E.D. Pa.1965). Although Senator Wheeler was there referring to the § 5(10) exemption from the formalities of § 5 transfers for the sale of operating rights between carriers which involve less than twenty vehicles (such transfers fall within § 212(b) and the transfer rules, United States v. Resler, 313 U.S. 57, 61 S.Ct. 820, 85 L.Ed. 1185 (1941)), the same general policy applies to transfers, as here, between carriers and companies which are neither carriers nor affiliated with carriers. See Atwood's Transport Lines—Lease—Clarke, 52 M.C.C. 97, 107 (1950).

Several decisions have upheld these regulations against challenges by parties who were objecting to a permitted transfer that they violated § 5 of the Administrative Procedure Act, 5 U.S.C. § 554(a), and the Due Process clause of the Fifth Amendment. Chemical Leaman Tank Lines, Inc. v. United States, 251 F.Supp. 269, 273–274 (E.D.Pa. 1965); A. L. Root Transportation, Inc. v. United States, 280 F.Supp. 152, 157 (D.Vt.1968); Monumental Motor Tours, Inc. v. United States, 316 F.Supp. 663, 667 (D.Md.1970). Cf. Pfizer, Inc. v. Richardson, 434 F.2d 536, 542–543 (2 Cir. 1970). Plaintiff does not challenge the validity of the Transfer Rules in general, as distinguished from their application to the particular facts.

In this case, the statute and regulations, intended to provide a simple procedure and avoid unnecesseary oral hearings, have led to labyrinthine proceedings, too complex to warrant description here, stretching over some twelve months. These have included a full-scale opinion by Division 3, —— M.C.C. —— (1971), reversing the Motor Carrier Board's original denial, without benefit of a presentation by any private party in support of the Board's action. Somewhere along the line, the Commission might well have considered whether an oral hearing, which could hardly have taken more than a day or two, might not have saved time and reams of paper, as well as satisfying Aaacon and another protestant that they had been given a full opportunity to present their case. However, our task is not to instruct the Commission how to conduct its business, but to determine whether it violated plaintiff's legal rights.

■ The initial question is whether the Commission erred in determining that the transfer could be processed under § 212(b) of the Motor Carrier Act, 49 U.S.C. § 312(b), rather than under § 5 of the Interstate Commerce Act, 49 U.S. C. § 5, where an evidentiary hearing would have been mandatory, 49 U.S.C. § 5(2) (b), unless the transaction came within the exception provided in § 5(10)

for transactions between motor carriers where the aggregate number of vehicles does not exceed twenty. To answer this, we must state the facts that led to the transaction at issue.

Nationwide, owned by Neddie Herman and her son Allen, had engaged since 1965 in automobile driveaway business as an agent in the Insured Driveaway System (Insured). Insured, in turn, participated in a joint rate operation of two authorized carriers, Insured Transporters, Inc. and George F. Burnett Company, Inc., whose combined certificates permitted driveaway operations throughout the United States with minor exceptions not here material. Effective June 1, 1971, Burnett cancelled its concurrence, thereby limiting the operations of insured and its agents, including Nationwide, to the transport of stolen and repossessed automobiles and, to a limited extent, unrestricted driveaway service in thirteen western states. It was this threat of a drastic curtailment of their agency function that led the Hermans to negotiate for the purchase of the nonradial rights of Dealers for secondary automobile driveaway service in forty-four states. These rights, as will hereafter appear, produced a relatively inconsequential percentage of Dealers' revenue under its broad authority to transport automobiles and other types of motor vehicles and parts throughout a large part of the United States. Since Nationwide had not theretofore been a carrier, § 5 would apply only if, as provided in subparagraphs (5) and (6), it was affiliated with a carrier at the time of consummation. Paragraph (6) defines affiliation as follows:

(6) Affiliation with a carrier defined. For the purpose of this section a person shall be held to be affiliated with a carrier if, by reason of the relationship of such person to such carrier (whether by reason of the method of, or circumstances surrounding organization or operation, or whether established through common directors, officers, or stockholders, a voting trust or trusts, a holding or investment com-

pany or companies, or any other direct or indirect means), it is reasonable to believe that the affairs of any carrier of which control may be acquired by such person will be managed in the interest of such other carrier.

Aaacon's contention is that Nationwide was and continues to be an affiliate of Insured Transporters. The basis for this claim is that at the time of the transfer Nationwide had not yet terminated its agency agreement with Insured and that, in some unspecified sense, Insured Transporters is actually the "alter ego" of Nationwide. Inspection of the agreement shows that this conferred only limited agency authority, with Insured Transporters, Inc. remaining the carrier, cancellable by either party on thirty days' notice. We see nothing in this which remotely suggests that the rights acquired by Nationwide "will be managed in the interest" of Insured Transporters, Inc. Nor have we seen any documented support for the allegations that Nationwide dealt at less than arms length with Insured Driveaway System and Insured Transporters, Inc. or that there is any "alter ego" relationship between the two firms. We thus do not reach the question whether in a case where there was room for fair debate concerning the applicability of § 5, the Commission would be required to hold an evidentiary hearing on that issue before determining to proceed under § 212(b). See also Chemical Leaman Tank Lines v. United States, *supra*, 251 F.Supp. at 272.

One reason that had led the Motor Carrier Board to deny approval in the first instance was its belief that the transfer would come under one of the "General bases for disapproval" stated in the Transfer Rules, namely, that it would "permit the separation of a commodity or commodities from a class of substantially related commodities or from general-commodity authority." § 1132.5(a)(3).[5] Implicit in this was the thought that the secondary driveaway rights which were to be transferred were "appurtenant" to the initial driveaway rights which were to be retained.

Division 3 rejected this view on the basis of a change in industry practice. Relying on affidavits by two transportation experts furnished by the applicants, it concluded: [6]

Today, each type of authority is different, they comprehend a different type of service, and each is granted based on a differing need for service. Under today's regulatory scheme, initial authority is granted to cover the movement of new automobiles, which now move exclusively by truckaway service, or by rail. On the other hand, secondary rights are generally issued to cover used cars. These secondary rights are for the purpose of meeting a demand for a new type of service under automobile secondary driveaway authority. The transportation performed under present-day conditions pursuant to secondary automobile authority is for and on behalf of private owners of automobiles; for banks; for finance companies; for corporations moving their own as well as employees' cars, government vehicles and vehicles owned by service personnel. In view of the fact that the two types of authority comprehend different services performed for different shippers, applicants contend that it is incorrect to say that today a secondary right is appurtenant to its companion initial authority and therefore inseparable.

On the facts before us we have no ground for quarreling with the Division's conclusion. But, as indicated

---

5. The Board also believed that because Dealers' affiliate, C & J Commercial Driveaway, Inc., held rights similar to those which were to be transferred, the transaction would violate §§ 1132.5(a)(1), (d) which prohibit transfers that would create duplicating rights. The

Commission met this point by imposing on Dealers and its affiliates conditions against secondary driveaway of automobiles, see note 3, *supra*.

6. M.C.C. (1971), unprinted opinion at 7–8.

above, we are somewhat troubled by the manner in which the agency reached what Commission counsel at argument conceded to be an important policy determination. In a well-known passage in the second opinion in SEC v. Chenery Corporation, 332 U.S. 194, 202–203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Court reminded the agencies that, since they possessed substantive rule-making powers not given to the courts, policy making "should be performed, as much as possible through this quasi-legislative promulgation of rules to be applied in the future." It recognized also that special types of problems might arise which would be best handled by the "case-by-case evolution of statutory standards" and added that "the choice made between proceeding by general rule or individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency."

A claim that a marked change in industry practice had made prior policy untenable would seem to be ideally suited for the rule-making procedures of § 4 of the APA, 5 U.S.C. § 553, even when, as here, the change was not in the rule previously enunciated but in an important issue of application. Assuming as we must that under *Chenery* II we generally may not reverse an agency for opting for "*ad hoc* litigation" instead of rule-making even when a new rule of conduct is being announced, we would suppose the Court was thinking of that invaluable aid to the reaching of a correct determination of litigation, an adversary proceeding. Under the procedure prescribed in the Transfer Rules, there had not been a genuinely adversary proceeding when Division 3 made its pronouncement. While the applicants bore the burden of demonstrating to Division 3 the Motor Carrier Board's error and reconciling the proposed transfer with the language of the Transfer Rules, the Commission did not have the benefit of a presentation either by private persons or, so far as the report discloses, even by its own staff, adverse to those put forth by the applicants on the cur-

rent state of the driveaway industry. Consequently, if Aaacon's petitions for reconsideration had included any assertions of fact or law that would cast even slight doubt on the soundness of the Division's conclusions, we would remand —if only for the therapeutic effect, which we suppose would be all that a remand would have. However, careful examination of the manifold papers submitted by Aaacon to the Commission discloses none.

Aaacon next insists that an evidentiary hearing was needed to enable it effectively to contest Division 3's conclusion that Nationwide's balance sheet giving effect to the transfer and its income projection warranted a conclusion that it was "fit and able to consummate the proposed transaction and to conduct operations under the sought rights." Aaacon's difficulty lies in its failure to support its request for an oral hearing with "an explanation as to why the evidence sought to be presented cannot reasonably be submitted in affidavit form," as required by § 1132.4. See Chemical Leaman Tank Lines v. United States, *supra,* 251 F.Supp. at 272–273; A. L. Root Transportation, Inc. v. United States, *supra,* 280 F.Supp. at 156. Projections of revenues are notoriously resistant to cross-examination; the most effective way to challenge them, once their basis has been explained by the maker, is by argument or rebuttal. While Aaacon noted that the projected revenue was more than three times Nationwide's old agency revenue, the discrepancy lacked significance in view of the fact that the proposed operation was expected to be the hub of a network of some twenty nationwide agencies rather than simply one spoke of the old Insured Driveaway System. Apart from this, Aaacon submitted nothing specific to show that Nationwide's projections were unduly optimistic.

A further issue raised by Aaacon is that Drivers' secondary driveaway authority had become dormant. Here again Aaacon failed to demonstrate the

need for an evidentiary hearing.[7] It relied on a traffic study attached to the petition and suggested no further facts that could be developed. The question rather was one of policy or of law. The study showed only twenty-five secondary driveaway automobile shipments by Dealers during the six months preceding the application for transfer, all under Government bills of lading, between fourteen states of origin and fourteen of destination. There were no operations from or to thirty of the forty-four states in the authorization transferred. These are small figures indeed when compared with 10,000 vehicles shipped by Aaacon and also by another protestant during the same period.

We must confess that if we were making policy, we would think twice about allowing a carrier whose service had dwindled to such a low level as Dealers' secondary automobile driveaway operations to create a new competitor by a transfer of these vestigal rights, receiving in the process $300,000 which Nationwide must ultimately recoup from customers. As pointed out in Gregg Cartage & Storage Co. v. United States, 316 U.S. 74, 83, 62 S.Ct. 932, 86 L.Ed. 1283 (1942), a case relating to the grandfather clause, § 206(a), of the Motor Carrier Act, 49 U.S.C. § 306(a), "any substantial interruption of one carrier's service tends to result in expansion of other facilities to meet the continuing needs of shippers, and thus to cause overcrowding if the suspended service is resumed." A similar analysis applies when service has been reduced close to the vanishing point. It is not a complete answer that the holder of the certificate is free to reactivate it whenever he wills; his failure to make significant use of his rights gives competing carriers some basis for belief that he is unlikely to do this. If service by another carrier is warranted, nothing prevents certifi-

cation in a proceeding where the carriers who had provided "other facilities" could be heard.

However, the Commission has resolved otherwise in the Transfer Rules. Section 1132.5(b), entitled "Cessation of operations," reads in relevant part:

> *Cessation of operations.* The mere cessation of operations by the holder of an operating right shall not be deemed to require denial of the proposed transfer of such right. If, however, a cessation of operations has occurred, which fact shall be stated in the application, and operations have not been conducted under the considered rights for a substantial period of time, the proposed transfer will be denied unless the holder shows that such discontinuance was caused by circumstances over which he had no control.

If total cessation of operations will not prevent approval of a transfer when the cessation was due to circumstances beyond the transferor's control, the Commission can justifiably reason that reduction to a small volume will not do so even though this was voluntary. The distinction which Aaacon persistently ignores is that whereas § 5(2) requires a finding that a transaction governed by § 5 "is consistent with the public interest," § 212(b) contains no such requirement. While action of the Commission under this section, as under all, is subject to the National Transportation Policy, Transportation Act of 1940, 54 Stat. 899 (1940), this is so vaguely worded that it does not prevent the Commission's providing in the Transfer Rules for approval of the transfer of a motor carrier certificate, even a virtually moribund one, to a non-carrier on a finding of fitness, willingness and ability alone, except in the circumstance provided in § 1132.5. See Karl E. Momsen Purchase (Portion)—DeVries and Paekal, 63 M.C.

---

7. While Aaacon also sought to develop such factors as the percentage of Dealers' total revenue which it realized from the exercise of the rights in question, or the percentage of its assets employed in the exercise of those rights, such tests have been held to be inappropriate to a § 212(b) proceeding, see Karl E. Momsen Purchase (Portion)—DeVries and Paekel, 63 M.C.C. 631, 634-35 (1955).

C. 631, 634–35 (1955); Stearn v. United States, 87 F.Supp. 596 (W.D.Va. 1949). Congress evidently believed that in motor carriage a transfer of operating rights by a carrier to a non-carrier was generally not a matter of serious public concern.

We have considered Aaacon's other arguments but do not deem them of sufficient merit to warrant discussion. The clerk will enter judgment dismissing the complaint, with costs.